



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed October 3, 2017

United States Bankruptcy Judge

___

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § § | |
| **Aeon Operating, Inc.,** | § § § | **Case No. 15-33935-hdh7** |
| Debtor. | § § | |
| **Scott Seidel, Trustee,** | § § | |
| Plaintiff, | § § § | |
| v. | § § | **Adversary No. 17-03028** |
| **Mercury Operating, LLC and PetroRock Mineral Holdings, LLC,** | § § § § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On April 11, 2017, Scott Seidel, as Chapter 7 trustee in the bankruptcy case of Aeon Operating, Inc. (the "Trustee") filed his *Original Complaint of the Trustee Against Mercury Operating, LLC and PetroRock Mineral Holdings, LLC* [Docket No. 1] (the "Complaint"). Through the Complaint, the Trustee seeks the avoidance and recovery of certain prepetition transfers from Mercury Operating, LLC ("Mercury") and PetroRock Mineral Holdings, LLC

("PetroRock" and together with Mercury, the "Defendants") as either fraudulent transfers or preferences. In the alternative, the Trustee seeks recovery from Mercury and PetroRock for breach of contract. The Court held trial in this matter on September 6, 2017 and took the matter under advisement. The following are the Court's Findings of Fact and Conclusions of Law.[1]

## I.   JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This adversary proceeding involves a core matter under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O). Venue for this adversary proceeding is proper pursuant to 28 U.S.C. § 1409(a).

## II.   FINDINGS OF FACT

Mr. Stefan Toth is the principal of both Defendants—PetroRock and Mercury. Specifically, Mr. Toth is President of HomeBound, Inc., which is the general partner of Home Bound Financial Group, L.P. ("HBFG"). HBFG is the managing member of PetroRock. HBFG is also the managing member of Mercury.

Mr. Keith Foree owned and controlled the majority of stock interest in both Aeon Operating, Inc. (the "Debtor") and Aeon Exploration, Inc. (the "AXI"), an affiliate of Debtor.

The Debtor was an oil and gas operator for certain wells known as the "Mina wells." As an oil and gas operator, the Debtor was responsible for the exploration, development, and production of the Mina wells numbers 1 through 5. In addition, the Debtor was responsible for selling the oil produced from these wells and paying the bills associated with such production. As the oil and gas operator, the Debtor incurred debts in its own name, was responsible for paying the

---

[1] The following are the Court's Findings of Fact and Conclusions of Law, issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052. Any Finding of Fact that more properly should be construed as a Conclusion of Law shall be considered as such, and *vice versa*.

operating expenses of the wells, and had discretion over whether and when to pay or dispute its debts.

On September 30, 2015, (the "Petition Date"), the Debtor filed a voluntary petition for bankruptcy, thereby initiating the Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

**The Purchase and Sale Agreement**

AXI owned a working interest in the Mina wells. On or about June 22, 2015 (100 days before the Petition Date), AXI and PetroRock entered into a Purchase and Sale Agreement (the "PSA") pursuant to which AXI sold its interest in the Mina wells to PetroRock.

The Debtor was named as a seller in one place in the PSA, but the PSA did not have a signature line for the Debtor, the Debtor did not sign the PSA, and the Debtor held no interests in the Mina wells to sell. Both Mr. Foree and Mr. Toth testified that the Debtor was not a party to the PSA. Paragraph 25 of the PSA states that "This Agreement is not intended to confer upon any person not a party hereto any rights or remedies hereunder, and no person other than the parties hereto is entitled to rely on any representation, covenant, or agreement contained herein."

In connection with the PSA, a $565,000 payment was made to AXI by wire transfer by one of the Toth affiliated companies. No payment was made to the Debtor in connection with the PSA. Nevertheless, the PSA had certain provisions requiring funds in the possession of the Debtor to be transferred to other parties. Because the Debtor was not an actual party to the PSA, however, the Debtor did not have enforceable obligations under the PSA.

On July 17, 2015 (75 days before the Petition Date), Katherine Hardwick (controller of the Debtor) signed a letter purporting to retroactively assign all of the Debtor's operating revenue as of June 1, 2015 to Mercury.

Mercury took over the operations of the Mina wells in Cherokee County as of July 1, 2015 from the Debtor.

**The Revenue Sweep**

On July 20, 2015 (72 days before the Petition Date), Mercury received $236,528.38 directly from purchasers of the Debtor's oil and gas production relating to proceeds from Debtor's operations for the periods prior to July 1, 2015 (the "Revenue Sweep").

The source of the $236,528.38 transferred in the Revenue Sweep was proceeds from the sale of oil and gas for wells operated by the Debtor (Mina wells 3, 4, and 5 in Cherokee County) and sold to Truth Resources. Truth Resources made the $236,528.38 transfer to Mercury in reliance on the July 17, 2015 Assignment of Crude Oil Payments signed by Katherine Hardwick on behalf of the Debtor.

As the operator, Debtor had control of the $236,528.38 that was transferred on July 20, 2015 in the Revenue Sweep. Had the $236,528.38 not been transferred to Mercury in the Revenue Sweep, it would have been available for distribution to the Debtor's creditors.

**The First Wire Transfer**

On July 27, 2015 (65 days before the Petition Date), the Debtor transferred $98,860.89 to Mercury by wire transfer (the "First Wire Transfer").

The source of the First Wire Transfer was the Debtor's operating bank account at Chase. The Debtor's operating bank account at Chase was a commingled account that held funds received from different sources that would be used in different ways. Had the $98,860.89 not been transferred to Mercury in the First Wire Transfer, it would have been available for distribution to the Debtor's creditors.

**The Second Wire Transfer**

On July 27, 2015 (65 days before the Petition Date), the Debtor transferred $18,589.45 to Mercury by wire transfer (the "Second Wire Transfer"). The purpose of the Second Wire Transfer was to reimburse Homebound Resources for an overpayment on the completion of the Mina 5 well. Homebound Resources was a creditor of the Debtor at the time of the Second Wire Transfer.

The source of the Second Wire Transfer was the Debtor's operating bank account at Chase. Had the $18,589.45 not been transferred to Mercury in the Second Wire Transfer, it would have been available for distribution to the Debtor's creditors.

Mr. Foree's testimony supports a finding that the underlying debt for refund of an overpayment on the completion costs of a well was incurred in the ordinary course of the Debtor's business affairs. The evidence presented by the Defendants, including the testimony of Mr. Foree, did not support a finding that the Second Wire Transfer was made in the ordinary course of business or financial affairs of both parties or that it was made according to ordinary business terms. The Court was not able to, for instance, compare the characteristics of this transfer made within ninety days of the Petition Date to similar transfers made preceding the ninety days prior to the Petition Date. Mr. Foree's testimony seemed to suggest that the Debtor would commonly incur debts similar to the obligation owed to Homebound Resources, but the Court was not able to compare the characteristics of this transfer to any other transfers in similar obligations to other parties.

**Facts Common to All Transfers**

The Debtor was insolvent at all times relevant to this case, including at the time of the Revenue Sweep, the First Wire Transfer, and the Second Wire Transfer.

No part of any of the transfers in question in this matter have been returned to the Debtor.

The Defendants did not pay any of the Debtor's operating expenses for April and May 2015, and the Debtor was not able to pay all of those expenses.

It is true that Mr. Foree testified that the funds transferred pursuant to the Revenue Sweep, the First Wire Transfer, and the Second Wire Transfer did not belong to the Debtor, but the Court notes that Mr. Foree was offering legal conclusions that have not been supported by the evidence admitted at trial.

### III.    CONCLUSIONS OF LAW

The Revenue Sweep was a transfer of an interest of the Debtor in property, made within two years before the Petition Date in which the Debtor received less than a reasonably equivalent value in exchange and was insolvent on the date of such transfer. As a result, the Revenue Sweep is an avoidable fraudulent transfer pursuant to Bankruptcy Code section 548(a)(1)(B).

The First Wire Transfer was a transfer of an interest of the Debtor in property, made within two years before the Petition Date in which the Debtor received less than a reasonably equivalent value in exchange and was insolvent on the date of such transfer. As a result, the First Wire Transfer is an avoidable fraudulent transfer pursuant to Bankruptcy Code section 548(a)(1)(B).

The Second Wire Transfer was a transfer of an interest of the Debtor in property, for the benefit of a creditor, on account of an antecedent debt, made while the Debtor was insolvent, made within 90 days before the Petition Date, that enabled the creditor to receive more than they would in a Chapter 7. The Defendants have not presented sufficient evidence to support an ordinary course of business defense under section 547(c)(2). The Defendants have not presented sufficient evidence to support a new value defense under section 547(c)(4). As a result, the Second Wire Transfer is an avoidable preference pursuant to section 547(b).

With regard to the PSA and the Trustee's breach of contract claim, the Court concludes that the Debtor was neither a party to the PSA nor an intended third party beneficiary of the PSA. As a result, the Trustee's claim for breach of contract fails.

The Trustee may, pursuant to section 550, recover the Revenue Sweep, the First Wire Transfer, and the Second Wire Transfer from Mercury as an initial transferee. No relief is granted against PetroRock.

###END OF FINDINGS AND CONCLUSIONS###